J-S17001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF:  B.G.G., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.N.U., FATHER | No. 3713 EDA 2017 |

Appeal from the Decree Entered November 1, 2017
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0213

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 08, 2018**

D.N.U. ("Father") appeals from the decree issued on October 26, 2017, and entered on November 1, 2017, that granted the petition filed by Bethany Christian Services ("Bethany") to involuntarily terminate his parental rights to his minor child, B.G.G. ("Child") (born in September of 2015), pursuant to sections 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1] After careful review of the record and applicable law, we affirm.

We glean the following facts and procedural history from the record. Father and Mother began a relationship in 2010, while both were students attending the Community College of Baltimore County, Maryland.  According to Father, the relationship was purely sexual, and the last time he and Mother had a sexual encounter was on December 31, 2014.  In April of 2015, Mother contacted Father and informed him of her possible pregnancy.  Father traveled to Mother's home in Philadelphia and provided her with a pregnancy test.

_____

[1] M.J.G. ("Mother") consented to relinquishment of her parental rights of Child by separate decree entered on the same date.  Mother is not a party to this appeal.

Father was physically present when Mother took the test, which confirmed her pregnancy.  Father did not see Mother again following the date of the positive pregnancy test.

Father was not present for the birth of Child in September of 2015.  Rather, he learned that Child was born a day or two afterwards, when he received a phone call from an unidentified male.  Following her birth, Child and her half-brother, J.G., were removed from Mother's care, because Mother left J.G. alone while giving birth to Child.  Despite Father's learning of Child's birth, that Mother had named him as the father, and that Child had been removed from Mother's care, Father did not visit Child or attempt to determine where she was taken.  In January of 2016, Child and her half-brother were returned to Mother's care.  Father claims that Mother refused to tell him her exact address, but admits that he did nothing to attempt to determine her address.  Although Mother and Father emailed each other throughout the winter of 2016, Father did not visit with Child.

In September of 2016, Mother contacted Bethany and expressed a desire to place Child and J.G. for adoption.  Mother met with Laura Wall ("Ms. Wall"), a Bethany caseworker, on September 15, 2016, to discuss placement options for her two children.  Ms. Wall contacted Father on September 19, 2016, to inform him that Mother had initiated an adoption plan for Child, as Mother had identified him as the only possible father.  Father refused to discuss adoption or a parenting plan for Child and insisted on a DNA test.  Father did not ask Ms. Wall about the welfare of Child or express to her any

desire to parent Child. Father also refused to provide any additional contact information to the agency.

Bethany placed Child, along with her half-brother, in a pre-adoptive home on September 22, 2016. On September 26, 2016, Mother signed her consent to adoption for both children. Ms. Wall called Father on November 11, 2016, and left him a voicemail message, which went unreturned. After investigating and finding an address for Father, Ms. Wall mailed him a follow up letter on November 22, 2016, which stated that Child had been placed in a pre-adoptive home and provided him with contact information of several legal service organizations. On November 25, 2016, Father contacted Ms. Wall's supervisor, Carrie Eckhardt ("Ms. Eckhardt"), and argued with her that an adoption could not proceed without DNA testing. Ms. Eckhardt sent a follow up letter to Father on November 28, 2016, and provided him with paternity testing information.

On December 23, 2016, Bethany filed a petition for involuntary termination of Father's parental rights. In the meantime, Father pursued DNA testing. On January 17, 2017, Father received the results of the DNA test, which confirmed that he is Child's father. A hearing was held regarding termination of Father's parental rights on October 25, 2017. At the hearing, Bethany presented testimony of Ms. Wall and Ms. Eckhardt, and Father testified on his own behalf. The court issued a decree from the bench (entered on the orphan's court's docket on November 1, 2017), terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

On November 28, 2017, Father filed a timely notice of appeal, along with a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Father presents the following sole issue for our review: "[Whether] [t]he [orphan's] court erred in finding clear and convincing evidence existed to terminate [Father's] parental rights under 23 Pa.C.S. § 2511(a)(1)[?]" Father's Brief at 5.

Before we reach the merits of Father's claim, we address *sua sponte* whether the representation of Child by Mary C. Pugh, Esquire ("Attorney Pugh") in the instant matter satisfies the requirements of Section 2313(a) of the Adoption Act, in light of recent decisions interpreting the requirements of this section.[2] Pursuant to 23 Pa.C.S. § 2313(a), Child has a clear statutory right to counsel in this contested involuntary termination proceeding:

> The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

*Id.* *See In Re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (holding that Section 2313(a) requires the appointment of counsel who serves the child's legal interests in contested, involuntary termination proceedings); *see also*

---

[2] "This Court must raise the failure to appoint statutorily-required counsel for children *sua sponte*, as children are unable to raise the issue on their own behalf due to their minority." *In re Adoption of: T.M.L.M.*, ___ A.3d ___, 2018 PA Super 87, *2 (filed April 13, 2018) (citing *In re K.J.H.*, ___ A.3d ___, 2018 PA Super 37 (filed February 20, 2018)).

***T.M.L.M***., 2018 PA Super at \*2 (declaring that "[a]ppointment of counsel representing the child is mandatory, and failure to do so is legal error").

In ***L.B.M.***, our Supreme Court explained that a child's legal interests are distinct from his or her best interests, in that a child's legal interests are synonymous with the child's preferred outcome, while a child's best interests must be determined by the court. ***L.B.M.***, 161 A.3d at 174.

> Importantly, the Justices disagreed on whether the role of counsel may be filled by a guardian *ad litem* (GAL) who also represents child's best interests. In the Court's lead opinion, Justice Wecht, joined by Justices Donohue and Dougherty, opined that a child's legal interests cannot be represented by a GAL. However, the Court's remaining four Justices disagreed with that portion of the lead opinion, and opined in a series of concurring and dissenting opinions that a child's dependency GAL may serve as his or her counsel, so long as the GAL's dual role does not create a conflict of interest.

***T.M.L.M.***, 2018 PA Super at \*2 (citing ***L.B.M.***, 161 A.3d at 180-82, 183-93) (internal citations omitted)). In his concurring opinion in ***L.B.M.***, joined by Justice Todd, Chief Justice Saylor added,

> in the absence of an actual or potential conflict between a child's legal and best interests, I see no reason why a guardian *ad litem* may not also serve as counsel. There are multiple scenarios in which a child's legal and best interests may be indistinguishable, including, *most notably, cases involving children who are too young to express their wishes*. In such circumstances, mandating the appointment of separate counsel seems superfluous and potentially wasteful.

***Id.*** at 184 (emphasis added).

This Court has since expanded upon the Supreme Court's decision, and explained that an attorney serving as a child's dependency GAL may serve as

- 5 -

his or her counsel, so long as the child's legal and best interests are not in conflict. *See In re D.L.B.*, 166 A.3d 322, 329 (Pa. Super. 2017) (interpreting *L.B.M.* and declining to remand for appointment of additional counsel for child who was represented by an attorney who advocated for child's non-conflicting best and legal interests).

Here, we discern no conflict between Child's best interests and legal interests that would warrant the appointment of separate legal counsel for Child. Attorney Pugh clearly represented Child's best interests in this matter. She was present at the termination hearing, actively participated in the questioning of witnesses, and supports termination of Father's parental rights. With respect to Child's legal interests, our review of the record does not reveal that Attorney Pugh's position differed from Child's preferred outcome. Child was just over two years of age at the time of the termination hearing, and it is clear that she was too young to provide any input on whether Father's parental rights should be terminated. We are convinced that Child is precisely the type of child the dissenting and concurring justices in *L.B.M.* envisioned as too young or too incapacitated to express her wishes. Therefore, no remand is necessary.

We now turn to Father's claim, in which he argues that the orphans' court erred in terminating his parental rights involuntarily. Father's Brief at 7-10. We review Father's issue mindful of our standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency

- 6 -

cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, … 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; *see also **Samuel Bassett v. Kia Motors America, Inc.***, … 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, … 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, … 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re S.H.***, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to

enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to sections 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> …
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1) and (b).

As we addressed the application of section 2511(a)(1) in *In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003), we noted:

> To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*Id.* (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). In *C.M.S.*, we further acknowledged the following statement by our Supreme Court:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life[.']

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

Instantly, Father avers that the orphan's court erred in terminating his parental rights under Section 2511(a)(1). Contrary to what is reflected in the record, Father claims that he attempted to have and maintain a relationship with Child, but that Mother prevented him from having such a relationship or any real contact with Child. Father's Brief at 7. Father further avers that Mother informed him "there were other potential fathers with whom [she] had relations." *Id.* Accordingly, Father requested DNA testing, but insists that Mother continuously obstructed his efforts to determine paternity. *Id.* at 8. Father also alleges that he made it clear to Bethany that "he had every intention of parenting and caring for [Child]," but that, first, he wanted to confirm that she was in fact his child. *Id.* Finally, Father claims that he provided Mother with emotional, physical and financial support since the birth of Child. *Id.*

The orphan's court did not find Father's testimony to be credible. *See* N.T. Termination, 10/25/17, at 265. At the conclusion of the termination hearing, the Honorable Cheryl L. Austin opined on the record:

[P]arental duty requires that the parent act affirmatively with a good faith interest and effort and not simply yield to every problem even in difficult circumstances. A parent must use all available resources and exercise reasonable firmness in resisting obstacles placed in the path of maintaining that very important parent-child relationship.

Throughout this hearing[,] the [c]ourt has heard evidence regarding repeated displays of [Father's] refusal to perform parental duties throughout [Child's] life. Such displays indicate to this [c]ourt a settled purpose of relinquishing parental claim to this child.

I am going to cite specific evidences present before this [c]ourt.

…

[Father] was not present at the birth of [Child].

This [c]ourt notes that the documents contained within [Bethany's] Exhibit P-1 illustrates considerable tension and hostility between [Mother] and [Father].

According to [Father's] testimony, his paramount concern throughout was establishing paternity. To this [c]ourt's finding[,] this concern exceeded the issue of fulfilling parental duties.

The documents within P-1 confirm [Father's] testimony that there were times that they didn't get along, but there were also circumstances in that document that show where [Mother] and [Father] did get along, sharing details about the baby's health, clothing, and even photos.

This sharing is not consistent with tension and hostility. It directly contradicts the testimony that [Mother] would not share her address. In fact, one item in P-1 documents that [Mother] inquires as to when [Father] would visit.

This [c]ourt therefore finds [Father's] testimony lacks credibility. [Father] presents before this [c]ourt as an extremely intelligent man, speaking very eloquently. I cannot believe the testimony I heard regarding the fact that there is no recollection of amounts spent for [Child], nor can I believe that someone as intelligent as [Father] could not locate or use resources to find [Mother's] address.

This [c]ourt finds that [Father] intentionally relinquished his parental duties by the following:

He failed to visit [Child].

He failed to visit her even when he did have her address.

He failed to send money to care for [Child].

His testimony implies that [Mother] had it covered, yet there were numerous complaints in P-1 when [Mother] requested financial assistance.

The failure to send cards, gifts, and even money when he testified that he knew [Mother's] address through the mail.

Pennsylvania statute requires affirmative efforts on the part of parents. You have got to do something. You have to do something.

[Father] failed to follow through on his legal options available. The delay in paternity testing is especially troubling, occurring 15 months after the baby's birth. Those delays, a lot of those delays, are attributable to the efforts of [Father] himself. He put those obstacles in his path.

[Father] failed to sign up with the birth registry and he failed to pursue custody proceedings prior to the initiation of adoption efforts.

[Father] even failed to work with the agency that had custody of [Child] related to placement.

…

[Child's] needs and [Father's] responsibilities began at birth, not when a positive DNA result was received.

[Child's] needs and the responsibility to care for her are paramount. [Father] only made efforts after paternity was established. Prior to that time[,] [Child] had needs that were not met by [Father].

In this case at hand, the [c]ourt hereby determines that the petitioner has establish[ed] by clear and convincing evidence that [Father] has failed to perform any parental duties for a period of more than six months prior to the filing of the petition for termination of parental rights as cited under Section (a)(1).

*Id.* at 263-67. After careful review, we discern that the court's determinations are well-supported by the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, Father maintains that he has always expressed his concern about Child's welfare. Father had his first visit with Child in February of 2017, which he described as "amazing and awesome." Father's Brief at 9. Father asserts that he "established a bond with [Child]," which he believes was further strengthened by his ability to see her in person. *Id.* Father requests the

opportunity to "be the parent he has wanted to be and the child needs." ***Id.***

Based on our review, the record clearly belies Father's claims.

At the termination hearing, Ms. Eckhardt testified that Child had been in her pre-adoptive home for over 13 months and reported:

> [Child] is thriving. Her needs are being met abundantly. She is deeply loved. She is very, very attached, you know. She attached to them early on. But it's grown and blossomed. She identifies with them very much as mommy and daddy, willing of her own volition will say, I love you to them, and just really pursues them. She is doing great. Her medical needs are being met. She is up-to-date on her immunizations. She is eating well and sleeping well. She follows [her adoptive mother] around the house and, you know, mimics things that she is doing. And just really, you know, she has just a really special relationship with both of her parents and with [J.G.].

N.T. Termination at 249-50. Ms. Eckhardt also recounted the following regarding Father's one and only visit with Child:[3]

> [A]fter making sure things were set and prepared, I went and got Peter[, the adoptive father,] and [Child]. They came into the room. [Child] was initially very apprehensive. We walked in and [Father] immediately said: Come to dada to her, and she looked confused.
>
> So Pete, in an effort to try and get her comfortable, placed some toys on the floor and sat on the floor to try to get her to engage and kind of put her in between himself and [Father] and ... Joy.
>
> She interacted very calculated. This is a child I interacted with a lot and she was normally very bubbly and silly and engaged, and calculated is the best word I can think of. She was very intentional about slowly moving blocks and handing them to Pete

_____

[3] The visit took place on February 7, 2016, at Bethany's office. Father's mother, Joy, accompanied him for the visit. Ms. Wall and Ms. Echkardt were also present, along with another Bethany employee.

and then maybe hand one to [Father], and then hand one to Pete, and just very calculated in her movements.

Eventually [Father] put [Child] in his lap and she initially looked a little confused, started to try to get down. He put her back in his lap. And after a few minutes, she started to hand Pete blocks until he was close enough and she crawled to him and put her arms around his neck.

…

So at that point[,] [Child] was starting to get upset and so we encouraged [Father and Joy] that that would be the time to get pictures if they were going to.

…

So, at that point, Joy … decided she was going to hold [Child,] and as soon as she picked her up she began to scream very loudly, crying, to the point where workers in other parts of our building could hear her. We could tell that she was distraught and said, Okay, if you are going to get pictures, we need to do this. She seems to be done.

At that point [Father] tried to hold her and she continued screaming and reaching for Peter…. [E]ventually she went to [Peter] and she was able to be consoled, but still kind of silently was crying and just very much overwhelmed at that point.

*Id.* at 240-42.

After hearing testimony from Father, Ms. Wall, and Ms. Eckhardt, the

orphan's court concluded:

In this case[,] the testimony clearly established due to a lack of any evidence other than the one visit [Father] had with [Child], it was clearly established that there is no affection between [Father] and [Child]. The [c]ourt received credible testimony that there is no parental bond between [Father] and [Child].

This [c]ourt heard credible testimony from supervisor Carrie Eckhardt regarding the strong bond of both pre-adoptive parents, about the focus of which these people devote to [Child].

This [c]ourt heard testimony that [Child] is thriving and is very attached to the pre-adoptive parents and she has a unique and

- 15 -

strong bond with them as is her unique bond with her brother that gives her the consistency and familiarity that she needs in her life.

Therefore, I find from the evidence and the testimony presented today that termination of [Father's] rights best serves the needs and the welfare of [Child] and that termination of the parental rights of [Father] will not irreparably harm [Child].

*Id.* at 270-71.

As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we conclude that the court did not abuse its discretion as to section 2511(b). *See S.P.*, 47 A.3d at 826-27. Accordingly, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/8/18